## *In re* ANDERSON, a Bankrupt.

### *Ex parte* GIBBONY'S ADM'R.

### *Ex parte* KENT'S ADM'R.

### *Ex parte* SMITH and others, and other Petitions.

*(District Court, W. D. Virginia.* March 18, 1885.)

**1. BANKRUPTCY—SCHEDULE—CREDITORS' BILL—WIFE'S PROPERTY.**

In his schedule the bankrupt included his life-interest in lands inherited by his wife from her father. There was a question whether this was a life-interest by the curtesy, or a fee acquired by transactions which occurred between the administrator of the decedent and the bankrupt before the bankruptcy, and the co-heirs of the bankrupt's wife. After the commencement of the bankruptcy proceeding, certain creditors of the bankrupt filed a general creditor's bill in a state court, making the bankrupt, his wife, and his assignee in bankruptcy parties defendant; and therein sought to settle the title of the land received by the wife as her share in her father's estate. During the progress of this suit in the state court the wife was, while under moral duress and pressure, induced to sign an agreement jointly with her husband and the attorney of creditors that she would by deed relinquish her interest in three-fourths of her lands, and acknowledged it before the person who was to be her trustee in the other fourth; but this agreement was never recorded as the deeds of married women are required to be by the Code of Virginia; yet it was ratified by decree of the state court. *Held,* that the creditors' suit in the state court was *coram non judice,* and could not affect the bankrupt's estate, or the rights of any one having a "specific claim" upon it or any part of it; who, as this wife did, came into the bankruptcy proceeding asking protection. *Held,* that the bankruptcy court had exclusive jurisdiction to administer the bankrupt's estate, and to adjudicate between the assignee and any person having such "specific claim;" especially if that person came voluntarily into the bankruptcy court and asked for such adjudication. *Held,* that the written agreement signed by the wife to convey away three-fourths of her interest to save the other fourth, was void (1) because not signed by the assignee; (2) because the signing of it by the bankrupt was nugatory, he being *civiliter mortuus* as to the estate; (3) because it was executory and of the nature of a power of attorney, which a married woman is not authorized to execute by the Virginia statutes; (4) because it was acknowledged before an interested notary; (5) because it was not recorded in the manner required by statute. *Held,* that the assignee had no power to give consent to an extrajudicial decree of the state court, the laws of congress nowhere authorizing him to become defendant to a suit commenced *in invidiam* towards and essentially in conflict with the jurisdiction which the bankruptcy legislation of congress gives to the bankruptcy court.

**2. SAME—WIFE AS WITNESS.**

In proceedings in bankruptcy the wife of the bankrupt is a competent witness to facts affecting the estate in bankruptcy, and so is every party to any "trial or cause" arising under the bankruptcy act, (section 8, act June 22, 1874, amending section 26 of the general bankruptcy act.)

**3. SAME—HUSBAND AS TRUSTEE.**

Where a husband has by fraud or mistake been invested with the title in fee-simple of real estate inherited by his wife, equity will treat him as trustee of his wife, and a court of bankruptcy will refuse to subject the land to liens of the creditors of the husband who is a bankrupt.

**4. SAME—LIMITATIONS**

The limitation of two years to suits brought by or against assignees against or by persons in adverse interest, provided in section 4979, Rev. St., applies to suits at law and in equity brought independently of and separate from the bankruptcy proceeding proper, on the common law or equity side of the courts entertaining them; but does not interfere with or limit the jurisdiction of the bankruptcy court to "ascertain and liquidate liens and specific claims,' and to

adjust the various priorities and conflicting interests of all parties" to the bankruptcy proceeding proper. In these latter the bankruptcy court proceeds as directed by section 4972, without reference to the two-years limitation.

5. SAME—EFFECT OF BANKRUPTCY PROCEEDINGS.

The proceeding in bankruptcy is equivalent to the general creditors' bill in chancery, and is a plenary proceeding, its practice being prescribed by statute, and to that extent variant from the chancery practice obtaining in creditors' bills. So far as not varied by statute, the practice should be the same. The collateral proceedings incident to and arising in the course of a bankruptcy proceeding, in the form of petitions and motions *nisi*, against persons already parties to the bankruptcy proceeding, are of the same character as like collateral proceedings incident to and arising in a creditors' bill in chancery; and are summary, or not, only where they would be so in a creditors' bill, except where allowed by statute.

6. SAME—NEW PARTIES.

A stranger to a bankruptcy proceeding may come into it voluntarily, by petition or other plenary method, and submit to the bankruptcy court his rights touching property in the custody of the court, claimed as assets by the assignee in bankruptcy.

7. SAME—EFFECT OF PROCEEDING.

The petition of such a party, filed collaterally in a bankruptcy proceeding, calling for an answer, which answer is filed, and under which depositions are then taken and a hearing had, on a formal making up of issues, is a plenary proceeding and binds all parties to it.

8. SAME—BANKRUPTCY RULE 32—EQUITY RULE 88.

Under rule 32 in bankruptcy the practice in bankruptcy proceedings must be conformed, when practicable, to the practice in equity; and therefore, under rule 88 in equity, petitions for review in cases where appeal lies must be brought within the term of the court in which the decree sought to be reviewed was rendered; otherwise, petitions for review will not be heard by the bankruptcy court. Therefore, it is too late for a review of its own decree by a bankruptcy court when the petition for review is not filed within the term of the court at which the decree is rendered, and when an appeal could have been taken.

In Bankruptcy. On petitions for review.

*Robert Stiles*, for bankrupt's wife.

*John J. Wade* and *T. E. Sullivan*, for creditors and assignee.

HUGHES, J. The proceeding in bankruptcy of George W. Anderson was commenced on the twenty-ninth December, 1868, and the adjudication was made on the twenty-sixth January, 1869. The petition was filed at Richmond, in the district court for Virginia, when the state constituted but one judicial district. The proceeding went on at Richmond until the sixteenth June, 1881, when, under the act of congress approved on the third of February, 1871, providing for the division of the state into two judicial districts, it was removed into this, the Western, district of Virginia. The proceeding remained at Richmond 10 years after it could have been removed here. While at Richmond most of the proceedings in it were had under my supervision as district judge there. After it was removed, it came again, in consequence of the resignation of Judge RIVES, under my direction during the period of about 13 months, when I was performing the duties of judge here. It is now before the court on petitions for a review of my decrees rendered here and at Richmond, and as such has come to me along with several other cases which were in my hands when my brother, the Hon. JOHN PAUL, became judge in this district.

A very large part of the estate surrendered in this proceeding consists of realty. What the bankrupt's interest was at the time of surrender, in the realty in which he had estate, is a subject of litigation. The realty surrendered consists of two pieces of land, one containing (at first 1,200, now) 1,100 acres, the other 335 acres. The 1,100 acre tract was the home place of Jacob Kent, deceased, who was the father of the bankrupt's wife, Mrs. Sarah J. Anderson. This home tract lies in the county of Montgomery, Virginia, in this judicial district, and on it the bankrupt, George W. Anderson, and Sarah J. Anderson, reside. They have it in actual possession, but, as to the bankrupt himself, it is in the constructive possession of his assignee in bankruptcy, John Gardner; C. B. Gardner, who was joint assignee, being now dead. One of the leading questions in this proceeding has been, whether the bankrupt had a fee-simple right in this 1,100 acres, or only a life-estate by the curtesy. The 335 acres of land surrendered in bankruptcy by George W. Anderson lies contiguous to the larger tract, which has been mentioned. It is conceded that the bankrupt had an estate in fee-simple in this smaller tract, and that this tract is liable to the liens of his lien creditors.

Whatever interest George W. Anderson had in the larger, or eleven hundred acre, tract, is also liable to the liens of his lien creditors. Whether his interest was in fee-simple or for life is a question of law subject to the decision of this court in this proceeding. It could be adjudicated nowhere else in a manner to bind this court or the property itself. Sarah J. Anderson claims that the eleven hundred acre home tract came to her as her interest in her father's estate, and is her own property. She claims this by petition and by amended petition presented to this court in this bankruptcy proceeding. She claims that the liens of the lien creditors of George W. Anderson affect only the life-estate of George W. Anderson in this tract, and that they do not affect her own title in it. This is a question between herself and George W. Anderson's assignee in bankruptcy. She has come voluntarily into this court by next friend, and asks the court so to decree. She claims only a contingent dower interest in the tract of 335 acres, and submits her rights in that tract to the adjudication of this court in this proceeding.

In order to a full comprehension of the questions which have arisen in this case, I will recapitulate, with some fullness of detail, the facts that characterize it. Sarah J. Anderson, wife of the bankrupt, was one of six children left by Jacob Kent, who died intestate in 1858, leaving large real and personal estate. The other co-heirs had received greater or less portions of the estate during their father's lifetime. In the division and distribution of the estate, it was found that the home farm was nearly equivalent to the interest of one of the heirs and distributees. It was desired by the family that some one of the heirs should purchase this home farm. Mrs. Anderson was persuaded and agreed to do so, and accordingly on August 26, 1858, the day on

which the home farm and most of the personal property of the estate were advertised to be sold, it was announced in the presence of the company that the home farm would not be sold, and that Mrs. Anderson had consented to take it as her share of the estate.

Robert Gibbony, administrator of Jacob Kent, was authorized by the heirs to settle among them their shares of the estate, and to make sale of the land for division. His authority was in the form of a power of attorney, dated the nineteenth of July, 1858, signed by the heirs, and the husbands of those who were *femes covert*. But this power of attorney had, of course, no validity in law to bind these *femes covert*. *Shanks* v. *Lancaster*, 5 Grat. 110. By a paper similarly signed, it was agreed by the several heirs that each might take part of the estate of the intestate, Jacob Kent, at such appraisement as might be made by persons appointed by the county court of Montgomery county, which was the county in which the intestate died and his estate was. On the seventh of February, 1859, there was an arbitration and appraisement (made by three citizens chosen for the purpose) of the home farm, which then consisted of 1,200 acres, (100 acres have since been adjudicated by this court to belong to one Joseph Kent,) and the valuation of it was thereby fixed at $13,248, which, as was recited in the paper signed by the arbitrators, was "to be paid for by Mrs. Anderson's entire interest in the estate." In short, the purchase of the farm was treated by all concerned as made by Mrs. Anderson; the consideration paid for it being her interest in her father's estate.

At some time during Gibbony's agency in selling the lands of the estate he sold to George W. Anderson, individually, a tract of 335 acres lying contiguous to the home farm, for the price of six dollars an acre. Gibbony went on to sell all the other of the numerous tracts of land belonging to the estate, none of which, except the home farm, was retained by any of the heirs. In the year 1862, (August 20th,) having made contracts for the sale of all the lands, and probably collected much of the purchase money, Gibbony caused deeds to be prepared, executed, and acknowledged, conveying, on the part of all the heirs, the several parcels of land (except the home farm) to the several purchasers of them. Mrs. Anderson, on the faith of having purchased the home farm with her own interest, joined in these deeds, granting fee-simple titles for all the other several parcels of the lands of the estate to the respective purchasers of them. She has not sought in this proceeding to set aside those deeds, but desires them to stand.

Notwithstanding the clear understanding which had been had at the beginning, and had continued for several years, between all persons in interest, and especially between Gibbony and Mrs. Anderson, that she had taken the home farm for her interest in the estate, yet Gibbony, in procuring the execution of the deeds conveying the several portions of the realty belonging to the estate as just mentioned, caused the remaining heirs, in conveying their interests in the home

farm, to make a deed for it to George W. Anderson instead of Mrs. Anderson, and to reserve in this deed, dated August 20, 1862, a vendor's lien (now claimed in favor of Gibbony's widow and representative) for about $4,000, due from George W. Anderson, the bankrupt, personally, to the estate of Gibbony. On the twenty-first August, 1862, the day after this deed of the remaining heirs purports to have been executed, Gibbony, by a paper signed between himself and George W. Anderson, treated the home tract of 1,200 acres, and the tract of 335 acres purchased individually by Anderson, as both sold to Anderson himself, and took Anderson's bond for an aggregate sum made up of $13,248, which had been awarded by arbitration as the price of the home farm, and $2,010 or $6 per acre for the 335 acre tract. Whether or not Anderson's connection with these proceedings of Gibbony was fraudulent or not in intention, does not appear. Mrs. Anderson does not charge fraud against him or the co-heirs. I think he acted in ignorance of the legal purport of what he was doing. The objects of Gibbony seemed to have been to secure the debt of about $4,000, which he held against Anderson personally upon the home tract, as well as upon the other tract, and to make commissions as administrator upon the valuation price of the home farm ($13,248) as well as upon his actual sales.

No considerable amount of money, if any, was ever paid by George W. Anderson on account of this $13,248, and Gibbony, as to most, if not all of it, from time to time, as he settled his fiduciary accounts before commissioners, merely handed to Anderson receipts purporting that he had received from *Mrs. Anderson* amounts approximately making up the price of the home farm. Afterwards, when the transactions of August 21, 1862, came to be put in the form of G. W. Anderson's bond of that date, Gibbony credited these receipts, nominally from Mrs. Anderson, upon the bond.

Of these proceedings between Gibbony and her husband, Mrs. Anderson was all the while ignorant, and it would seem also that the deed from her co-heirs, conveying the home tract to Anderson instead of his wife, was never delivered to Anderson; that the execution of it to himself individually was unknown even to himself; that the co-heirs were not conscious of the effect of what they were doing, and that it was deposited for registration in the clerk's office of the county by Gibbony without the knowledge either of Anderson or his wife. The existence of the deed to her husband remained unknown to Mrs. Anderson or to her husband until some recent time, which is not shown in the evidence or the proceedings. For all that the proceedings show, she did not know of the transaction until December, 1872. In his schedule, B 1, George W. Anderson gave in his interest in the 1,200 acres of land which have been referred to, as a life-estate, reciting that this tract of land "was inherited by Sarah J. Anderson, wife of petitioner, from her father, Jacob Kent, and petitioner only has a life-estate in the same depending on his own life."

Notwithstanding the pendency of the proceeding in bankruptcy, the representatives of the estate of James R. Kent, who had recovered, in 1867, a judgment for a large amount against George W. Anderson, filed in August, 1869, a general creditors' bill in the circuit court of Montgomery county against G. W. Anderson and his two assignees in bankruptcy, for the purpose of subjecting his lands (treating the farm of Mrs. Anderson as his own in fee-simple) to their own judgment and those of all other lien creditors, including the vendor's lien for about $4,000 held by Gibbony's representative; all the liens amounting to about $19,000; the whole real property, including the home farm, being supposed to be worth upwards of $20,000. As the assignees in bankruptcy of George W. Anderson could not legally become or be made parties to this suit, the suit was *ex parte* as to George W. Anderson's estate; all of which was in the custody and under the jurisdiction of the bankruptcy court. Nevertheless, the state court entertained the bill, and proceeded with the suit until it was ready for hearing. Mrs. Anderson filed a cross-bill setting up her rights, but lost heart, and on the twentieth December, 1872, was made to believe that the deed of August, 1862, made by her co-heirs to her husband, of the home farm, had bereft her of her right to the whole tract; and was persuaded to sign, which she did with great reluctance and distress, an agreement with the attorney of the lien creditors of her husband, John J. Wade, by which it was stipulated that a decree should be entered for a division, by survey, of the home farm into four parts, giving the choice to herself of one of these parts, to be held by a trustee for her in separate right, in fee-simple, and for permitting the sale of the other parts for the benefit of her husband's lien creditors. As to parties, this agreement recited that it was made between George W. Anderson and Sarah Anderson, his wife, of the one part, and 12 creditors of George W. Anderson, to-wit: Floyd Smith; E. D. Slingluff & Son; D. Preston Parr; Hartman & Strauss; Mrs. Ellen Gardner; Isaiah A. Welsh, administrator of James R. Kent, deceased; McDowell, Robinson & Co.; Adams & Co.; T. J. Henderson & Co.; Keen, Baldwin & Williams; John R. Francis, administrator of A. W. Forest, deceased; and Mrs. E. Gibbony, administratrix of Robert Gibbony, deceased, acting through their agent and attorney at law, John J. Wade,—parties of the other part. The paper was signed and sealed by George W. Anderson, Sarah J. Anderson, "and John J. Wade, agent and attorney for the creditors of G. W. Anderson mentioned in this agreement." It was not signed by the assignees in bankruptcy of George W. Anderson.

All of George W. Anderson's interest in or control of the home tract of land having passed to his assignees in bankruptcy, his signing this agreement was nugatory. Mrs. Anderson's execution of the writing was privily acknowledged on the day of its date, namely, the twentieth December, 1872, before one of the counsel of the creditors, Thomas E. Sullivan, who was designated in the body of the writing

as the trustee who was to be intrusted with her title to the portion of her home farm which was to be set off to her. Her acknowledgment was made under circumstances of haste and pressure, and a consent decree, in accordance with the agreement, was hastily entered by A. Mahood, judge of the Montgomery court, on the day of its date, directing it to be carried into execution. The assignee of George W. Anderson (or rather the surviving assignee of two, one of whom is dead) did not sign the agreement of twentieth December, 1872, at the time, but he afterwards, to-wit, on the twenty-seventh November, 1875, indorsed on the copy of it his acceptance and adoption of it. He was then incapacitated from signing it by the prior injunctive orders of this court.

After this decree was entered and the survey for a division made, Mrs. Anderson joined her husband in a deed conveying the parts of the home tract, not retained by her, for the benefit of creditors, in pursuance of the agreement and decree just mentioned. This deed was acknowledged by her before the assignee of George W. Anderson, in bankruptcy, a party in interest, but was never duly delivered, was recalled before delivery, and that part of the decree has never been executed by herself and her husband. So far as her own action goes, therefore, there is no further committal of herself to the alienation of her home tract than the agreement she signed with the attorney of the creditors, and the decree of the state court made upon it, both on December 20, 1872. This paper of that date is void as to Mrs. Anderson. A married woman can validly execute no instrument except such as is authorized by section 4 of chapter 117 of the Virginia Code of 1873, page 906, which provides that "when a husband and his wife have signed a writing purporting to *convey* or *transfer* any estate, real or personal, she may appear before, etc., *  *  * and make acknowledgment of the same." No act of a married woman, unless the instrument signed presently *conveys* or *transfers* the estate, can be held to divest her of her rights in it. This power given by statute to a married woman does not apply to executory contracts, or to any other acts except deeds or writings making present transfer or conveyance of estate. 2 Minor, Inst. 582; *Shanks* v. *Lancaster,* 5 Grat. 110.

The writing signed by Mrs. Anderson on the twentieth of December, 1872, was wholly executory. It was a mere agreement that something should be done in the future. It is void on its face as to Mrs. Anderson, because it was executory and of the character of a mere power of attorney. It was void for two other reasons. The agreement stipulated that Thomas E. Sullivan, who was counsel for the lien creditors, should be the trustee to whom should be conveyed for her separate use that portion of the lands stipulated to be divided, which should be allotted to herself. Yet the record shows that her acknowledgment of this executory agreement was made before this very Thomas E. Sullivan, privily and apart from her husband. This

acknowledgment was void because it was made before an interested person. A fundamental maxim of jurisprudence is that no man can be a judge in his own case. Broom, 117. A grantee in a deed, or a beneficiary under it, is not allowed, as an officer, to take an acknowledgment of the deed by the grantor with a view to its registration. *Davis* v. *Beazley*, 75 Va. 495.

The agreement was also void because never recorded. The acts of married women, unlike those of persons *sui juris*, are void even as to themselves, unless authorized by express statute. It is the statute law alone which gives them validity, even as to themselves. The statute of Virginia requires that conveyances by married women shall not only be acknowledged before a designated officer, but recorded also. See section 7, c. 117, Code Va. 1873, p. 907. It is not pretended that Mrs. Anderson's agreement of December, 1872, and her acknowledgment of it, was ever recorded. Her acknowledgment before an interested officer was nugatory, and the failure to record it completely vitiated the paper. On its face it is absolutely null and void, because executory, because illegally acknowledged, and because never recorded.

Although the agreement was incurably null and void, and although the creditors' suit in the state court was inherently nugatory as to all the estate in the custody and control of the bankruptcy court, counsel for lien creditors contend that by her cross-bill filed in the suit in the state court, Mrs. Anderson submitted her rights to that court, and is bound by its decree directing the execution of the agreement of December, 1872. But that court had no jurisdiction to deal with titles and rights in property not only not within its custody, but in the custody of the bankruptcy court. The agreement, if it had any effect, passed three-fourths of the home farm to the assignees in bankruptcy of George W. Anderson, and subjected those three portions to the exclusive jurisdiction of the bankruptcy court. Mrs. Anderson could not by cross-bill confer jurisdiction upon the state court over that property. Neither express nor implied consent can give jurisdiction. As to the bankrupt's estate surrendered in bankruptcy, neither the assignees nor lien creditors, by consent, nor Mrs. Anderson, by cross-bill or agreement to assign a disputed three-fourths of the home farm to the use of lien creditors, could divest the bankruptcy court of its exclusive jurisdiction of the property surrendered and transfer it to another court. If Mrs. Anderson's agreement could be executed at all, there was no court competent to do so but the bankruptcy court. The creditors' bill in the state court was *coram non judice;* the estate of the bankrupt, including all property in which he claimed any interest, had passed to his assignees, and was in the custody of the bankruptcy court; and the cross-bill of Mrs. Anderson was as empty of jurisdiction for the state court to execute an agreement inherently and incurably void on its face, as so much brown paper.

George W. Anderson was *civiliter mortuus* as to his estate surrendered in bankruptcy, except, perchance, as to a homestead exemption. Claiming this, and in an effort to escape the action of the Montgomery court, he filed a petition in the bankruptcy court at Richmond, on the twenty-ninth July, 1873, praying an injunction against I. A. Welsh, administrator *d. b. n.* of James R. Kent, complainant in the suit in that court, and his other lien creditors, parties thereto, from all further proceedings therein; which was granted by the then judge of the court, Judge UNDERWOOD. The object of this petition was to have a homestead to the value of $2,000 set apart to the bankrupt out of the real estate he had surrendered in bankruptcy. This claim being inadmissible, that petition was afterwards dismissed, and the order of injunction granted upon it might have been dissolved, but for the fact that in December, 1873, Mrs. Anderson had come into the bankruptcy court at Richmond, by petition setting out the leading facts which have been recited, and praying the court to protect her rights, and either to set aside and annul the deed of her co-heirs to George W. Anderson, of twentieth, August, 1862, and require these co-heirs to convey the home tract to George W. Anderson only for his life, and, after his death, to herself and her heirs, or else to appoint a commissioner of the court to make the proper deed. That petition brought to the knowledge of the bankruptcy court, for the first time, the proceedings that had taken place in the circuit court of Montgomery county; the so-called agreement, which Mrs. Anderson had signed under the coercion of those proceedings, with the attorney of her husband's lien creditors; and the decree of the Montgomery court based upon that agreement.

The bankruptcy court decided, upon the petition, that the proceeding against George W. Anderson, a bankrupt and *civiliter mortuus* as to his estate, was *ex parte,* and as to the estate in bankruptcy and the assignees of the estate was *coram non judice* and null; the estate being in the custody and within the exclusive jurisdiction of the bankruptcy court, and the assignees having no power to make themselves parties to a proceeding in the nature of a creditor's bill against the bankrupt, his estate, and his assignees, commenced after the adjudication in bankruptcy. See *Case. of George W. Anderson,* 9 N. B. R. 360, and 3 Hughes, 379–385. Its decree to this effect was made on the sixteenth March, 1874, and was affirmed, on appeal, November 30, 1874. That question is therefore *res judicata* as between all parties to this proceeding. That decree also enjoined all further proceedings in the circuit court of Montgomery by the assignees, and by the parties plaintiff there, and no further steps have been taken in that court.

The case came again to a hearing in the district court at Richmond, as a court of bankruptcy, on the petition of Mrs. Anderson, by her next friend, which has been mentioned, on a plea of the statute of limitations interposed by the assignee to Mrs. Anderson's petition, and

on the petition and answer of Isaiah A. Welsh, administrator *d. b. n.* of James R. Kent, the creditor who filed the general creditors' bill in the circuit court of Montgomery county, which has also been mentioned. This petition of Welsh, administrator, filed December 7, 1875, prayed for a specific execution of the agreement signed by Mrs. Anderson on the twentieth December, 1872. As to the rest, it was an answer to Mrs. Anderson's petition.

At the hearing of these matters the bankruptcy court at Richmond, by decree of April 13, 1876, overruled the assignee's plea of the statute of limitations, on the ground that the exclusive jurisdiction of the bankruptcy court to pass upon all specific claims upon the bankrupt's estate, and to settle all conflicting interests between the various parties to a bankruptcy proceeding, is not affected by the provisions of the bankruptcy act limiting within two years suits brought by or against assignees in bankruptcy against or by persons in adverse interest; and that even if it were, Mrs. Anderson's petition was brought before the expiration of two years after she came to a knowledge of the fraud or mistake of which she complained.

The two-years limitation provided in section 4979 applies to the "suits at law and in equity" authorized by that section. It relates to suits brought independently of and separate from the bankruptcy proceeding, as such, to suits brought in the circuit or district courts, or in state courts on their common-law or equity side. It does not interfere with or limit the jurisdiction of the district courts on their bankruptcy side in bankruptcy proceedings to "ascertain and liquidate liens and specific claims, and to adjust the various priorities and conflicting interests of all parties" to the bankruptcy proceeding proper.

This petition of Mrs. Anderson is not a suit on the equity side of the district court, but is a collateral petition filed in, as part of, the bankruptcy proceeding. As such, it came here by removal from the Eastern district. If it were a distinct and several suit, it would not be here at all, but would still be pending at Richmond; for the order of removal made at Richmond embraced nothing but the bankruptcy proceeding. It was *verbatim* as follows:

"In the District Court of United States, Eastern District of Virginia, in Bankruptcy.

"*In the matter of George W. Anderson, bankrupt.*

"Upon the motion of Floyd Smith and Elizabeth Gibbony, administratrix of Robert Gibbony, deceased, judgment creditors of said bankrupt, it is ordered by the court that this cause be removed to the district court of the United States for the Western district of Virginia, held at Lynchburg, in said district. And it is further ordered that the clerk of this court transfer the papers herein to the clerk of said district court at Lynchburg.

"*Richmond, sixteenth June, 1881.*"

It was because Mrs. Anderson's petition was part of the bankruptcy suit, and not a suit distinct from it, that it came here under that order.

In its decree of the thirteenth April, 1876, the bankruptcy court ruled that the home farm having been paid for by Mrs. Anderson's property, the deed from the other devisees ought to have been made to her and not to her husband; and that the court, considering that to have been done which ought to have been done, and a resulting trust to have arisen to Mrs. Anderson, would direct a conveyance of the home farm to her by a commissioner, subject to the life-estate of her husband, which latter, together with the 335 acre tract, would be sold for the benefit of her husband's lien creditors. But this court declined at that time to order the sale, and gave leave to Mrs. Anderson, by amended petition, to make all the lien creditors, in behalf of whom the attorney, Mr. Wade, had signed the agreement of December 20, 1872, with Mrs. Anderson, parties defendant by name to her petition. The court in that decree dismissed the petition of J. R. Kent's administrator, in which he had set up the agreement of the twentieth December, 1872, in bar of Mrs. Anderson's claim, and pronounced finally against the administrator and the assignees. Previously to the decree there was a formal joinder of issues made up between counsel, dated December 10, 1875, in which it was stipulated in writing between Robert Stiles, counsel for Mrs. Anderson, on one side, and J. J. Wade, "attorney for assignee and lien creditors," on the other, among other things, that "the petition and answer of Isaiah A. Welsh, administrator of J. R. Kent, deceased,' * * * shall be filed *nunc pro tunc* as an answer and cross-petition to Mrs. S. J. Anderson's petition; * * * that the bankrupt and assignee, so far as they are necessary or proper parties, be considered as having waived service of process upon both said cross-petitions, and as consenting to the hearing of both; and finally that the evidence taken under the order of April 21, 1875, and all papers since filed or entered in the cause by consent, are to be considered as taken and filed under the issues as thus joined and made up." The stipulation also submitted the assignee's plea of the statute of limitations.

The order concerning evidence referred to had been entered eight months before the hearing. It was drawn up and applied for by Mr. Wade, "attorney at law for Kent's estate and other creditors of George W. Anderson," and gave Mrs. Anderson two months within which to take depositions in support of her claim, then gave the petitioning creditors one month for depositions in rejoinder, and afterwards Mrs. Anderson a month for her testimony in conclusion; the depositions to be taken on notice of 10 days. The depositions were exceedingly voluminous, making probably 500 pages. Notice of the taking of Mrs. Anderson's testimony was accepted by the assignees in bankruptcy, and in every instance by counsel signing "for the judgment creditors and Robert Gibbony's administratrix." The evidence was taken upon as full notice, and in as orderly and formal a manner, as any that was ever taken in the most plenary suit ever conducted in a court of justice. It was not only taken by parties on both sides

of the issues to be tried, and on full notice, but was taken in accordance with the previous order of court before mentioned, as drawn by the counsel for Kent's administrator, the other creditors of the bankrupt, and the assignees.

There can be no objection to these depositions, on the part of any creditors, for want of notice, or of presence, or opportunity to be present, at their taking. None has been made. No exceptions have been taken to them, save on the ground of the incompetency of Mrs. Anderson to testify for or against her husband, and of any of the witnesses to testify in their own interest as against Robert Gibbony, who is dead. But this suit is between Mrs. Anderson and her husband's assignees, not himself. Her husband has no interest in the property in litigation; all his interest having passed to the assignees. She is competent as to him. As to Robert Gibbony, neither he nor his estate has any direct interest in the property surrendered in bankruptcy. The assignees are the parties defendant, and represent many creditors, most of whom are living, and only a few dead. Mr. and Mrs. Anderson are competent witnesses as to the assignees, and all whom they represent, living or dead, on the general principles of evidence. But, whether so or not, they are competent witnesses by the express provisions of the bankruptcy act. Section 5088 expressly makes the wife of the bankrupt so, and the amending bankruptcy act of June 22, 1874, § 8, provides generally that any party to a "trial or cause" arising under the bankruptcy act shall be a competent witness.

No valid appeal has ever been taken from the decree of April 13, 1876, which was entered upon consideration of these voluminous depositions. As against Kent's administrator, the assignees in bankruptcy, and George W. Anderson, that decree stands as *res judicata*. The time for renewing it by appeal has long since expired, and the question of the right of Mrs. Anderson to the home farm, subject only to the life-estate of her husband, is forever concluded as against James R. Kent's estate and the assignees of George W. Anderson, representing all creditors. It is true that from the decree just mentioned Kent's administrator appealed to the circuit court. The matter was argued before Chief Justice WAITE, who, on the twentieth of May, 1876, entered a decree dismissing the appeal for want of jurisdiction, holding that the matter was one not for "revision," but for regular "appeal." The regular appeal, however, was never taken, and cannot now be taken, and the decree of April 13, 1876, is, as said before, final as against the assignees and Kent's administrator. More than that, it is now too late for a review of its own decree by the district court itself; for wherever appeal can be taken a petition for rehearing must be brought before the end of the term in which the decree has been rendered. Judges in bankruptcy will not hear petitions for review brought in disregard of this rule.

As before stated, the decree of April 13, 1876, after passing upon

the rights of Mrs. Anderson as against the assignees in bankruptcy and the lien creditors of the bankrupt, went on to give her leave to amend her petition by making all the lien creditors of the bankrupt, in whose behalf John J. Wade had signed the agreement of December, 1872, parties defendant to it. This turns out to have been unnecessary. The practice in such collateral proceedings, incident to bankruptcy proceedings, as that of Mrs. Anderson, had not then been settled by express adjudications of the supreme court of the United States; and therefore, notwithstanding the fullness of proofs, and completeness of opportunity which had been enjoyed by the assignees in bankruptcy representing all creditors, and by lien creditors, all represented by counsel of record, I thought it best to allow an amended petition to be filed by Mrs. Anderson, making formal parties defendant, by name, of the lien creditors who were interested in the agreement of the twentieth of December, 1872, which had been signed by Mrs. Anderson. If I had known then of the decision of the supreme court of the United States in *Stickney* v. *Wilt*, 23 Wall. 150, which had shortly before been rendered, and which appeared in the last and very tardily published volume of Mr. WALLACE, I should have entered a final decree at that time, not only against the assignees in bankruptcy and J. R. Kent's administrator, (against whom I did decree finally,) but against all the lien creditors of the bankrupt; for they were all parties to the proceeding in bankruptcy by force of regular publications, and bound by its adjudications whether expressly named in decrees or not.

It seems to be made necessary by the numerous motions and petitions which have been brought by counsel in this cause at various stages, in behalf of lien creditors, that I should enter to some extent into a dissertation upon the nature of a bankruptcy proceeding, as illustrated by the one at bar. The controversy between Mrs. Anderson and the lien creditors of the bankrupt, her husband, forms a necessary part of the bankruptcy proceeding. By virtue of George W. Anderson's having an estate in the home farm of her father, the fee of which she claims, this court and its predecessor in the Eastern district have had in this proceeding jurisdiction to settle the title to the home farm, as to this "specific claim" upon it. Whatever title the bankrupt had, passed to his assignees in bankruptcy at the time of his adjudication. The question whether the bankrupt had a title in fee or an estate for life only, was a question between Mrs. Anderson and the assignees. The creditors of the bankrupt were and are beneficiaries of whatever title has vested in the assignees, and are all represented in the litigation of the question by the assignees. The litigation as to the home farm is essentially between Mrs. Anderson and the assignees, and this court has jurisdiction of that litigation. It not only has jurisdiction, but that jurisdiction is exclusive. Section 4972 of the Revised Statutes of the United States declares that the jurisdiction of the district court shall extend, among other things,

to the collection of all the assets of the bankrupt; to the *ascertainment* and liquidation of the liens and other *specific claims* thereon; to the adjustment of the various priorities and *conflicting interests* of all parties; and to the marshaling and disposition of the different funds and assets, so as to *secure the rights of all parties,* and due distribution of the assets among all *creditors.* It is difficult to conceive how the jurisdiction of the court could be made more ample than it is made by this section, which gives jurisdiction not only as to all *creditors* of the bankrupt, but as to all *parties* to proceedings collateral to the bankruptcy proceeding. It does not allow persons having specific claims upon the estate of the bankrupt to. sign agreements with creditors to be specifically executed under decrees of other courts, but makes the bankruptcy court the arbiter of those claims. It authorizes the bankruptcy court to ascertain and secure the rights of all parties setting up "specific claims" upon the bankrupt's estate, and does not leave these parties, if married women, to wander into other courts for the obtainment of these rights. Its jurisdiction is as beneficent as ample, and it is difficult to see how the court could do complete justice between the numerous, often the multitudinous, parties to bankruptcy proceedings unless its jurisdiction was thus ample.

This jurisdiction is not only as comprehensive as just shown, but, I repeat, it is exclusive. Before June 20, 1874, it was not exclusive. The state courts, before that date, might have concurrent jurisdiction, *in sundry instances,* over debts and property of the bankrupt. So, also, might the circuit courts of the United States have concurrent jurisdiction under section 4979, cited at bar by counsel for lien creditors. But the act of that date, known as the Revised Statutes of the United States, in section 711, makes the jurisdiction of the district court in bankruptcy, as set out in section 4972, exclusive. It was made exclusive then, for the first time in the history of our federal jurisprudence. In *Claflin* v. *Houseman,* 93 U. S. 130–133, the supreme court of the United States say that the Revised Statutes, [of 1874,] "whether inadvertently or not," have made the jurisdiction of the United States courts exclusive "in all matters and proceedings in bankruptcy." In that case the court express a doubt whether the clause of section 4979 authorizing suits at law or in equity to be brought by or against assignees in bankruptcy, even in United States circuit courts, is not repealed by the provision of section 711 of the Revised Statutes of 1874, giving exclusive jurisdiction in bankruptcy matters to the district courts. Certainly is the concurrent jurisdiction of state courts taken away absolutely. This exclusiveness of jurisdiction was necessary. The proceeding in bankruptcy is, in character, effect, and object, the same as a general creditors' bill in chancery. It supplies the place and purpose of such a bill. It supersedes and dispenses with it. The two could not go along together, for it is an old principle that two courts cannot entertain several creditors' bills against the same debtor at the same time.

If, pending a bankruptcy proceeding, a creditors' bill for settling the affairs of the same bankrupt is brought in a state court or any other court, that bill is *coram non judice;* and the bill itself and all proceedings under it are null and void. It is unnecessary for the bankruptcy court, which has exclusive jurisdiction of the subject-matter of the bankrupt, his assignee and creditors, to declare them so. They are, inherently, essentially and absolutely so already. There is but one possible qualification to the general doctrine; which is that where, before the bankruptcy, another court has acquired full cognizance of any suit against the debtor *concerning specific property,* or even of a creditors' suit, it may go on and administer *whatever property* may have come into its custody or control, according to its own rules of decision; but its power to do this exists only in cases commenced before the debtor's bankruptcy. *Eyster* v. *Gaff,* 91 U. S. 521. It has no power to entertain the suit of a creditor after bankruptcy for cause of action arising before. The jurisdiction of the district courts is not only exclusive as to suits brought elsewhere *after* the bankruptcy, but is even so, in some instances, as to such suits brought and ended *before* the bankruptcy.

In *Humes* v. *Scruggs,* 94 U. S. 22, an assignee brought suit in the United States district court to set aside a deed of settlement, which had been made by a husband in favor of his wife, alleged to have been executed in fraud of his creditors. As a defense in bar to this suit the wife set up a decree which had been rendered in a suit brought by her next friend in a state court, before her husband's bankruptcy, against her husband, in which the deed had in all things been ratified and confirmed by the state court. The United States district court refused to go behind the decree of the state court, but the supreme court of the United States held, on appeal, that the adjudication in the state court did not bind the United States district court having jurisdiction of the bankrupt's estate. The point of the case, so far as it relates to the one at bar, is that the jurisdiction of the district courts of the United States over all the property belonging in law or equity to the bankrupt cannot be defeated by proceedings in other courts, no matter whether brought before or after the adjudication in bankruptcy. Therefore it is that there is nothing in the much-pressed point that Mrs. Anderson had, by her cross-bill in the creditors' suit in the Montgomery court, submitted her claims in the home tract to that court. The cross-bill was but a branch of a suit *coram non judice,* the nullity of which was fatal to the collateral proceeding. It was the more so because the decree against her in that suit was rendered upon an agreement null and void, as to herself, on its face. This court had to look into the record of the Montgomery court. It was invited to do so by the lien creditors. Thus invited, it did look into that record, and saw patently and prominently that the decree there was in execution of a writing incurably void and null. The case was precisely the same as that of *Humes* v. *Scruggs,* just com-

mented on, except that instead of the married woman there attacking the instrument on which the decree of the state court was founded, it was the assignee who did so. In that case the district court was held bound to pass upon the validity of the instrument and of the decree. So it is bound here. If the jurisdiction of the district court was good there to set aside the instrument and disregard the decree, so it is here.

The creditors' bill, which was brought against George W. Anderson and his assignees in the circuit court of Montgomery county, after the commencement of this bankruptcy proceeding, was *coram non judice;* it was not only so pronounced to be by myself, when the petition of Mrs. Anderson and that of J. R. Kent's administrator were first before me at Richmond, in March, 1874, but, on appeal, was declared by the circuit court to be null and void. In his opinion in affirmance the circuit judge said:

"It is clear that both Mrs. Anderson and her husband were entitled to be heard in the district court, and that the proceedings in the state court, commenced after adjudication in bankruptcy, were null and void, so far as they affected the rights of any person who might come into the bankruptcy court, claiming an interest in the property in litigation in the state court."

And the circuit court remanded the cause to the district court "with directions to proceed to ascertain the rights of the parties claiming the property in litigation in the state court." All this is *res judicata* as to Mrs. Anderson, the bankrupt, his assignees, and the administrator of James R. Kent. I may go further and say that all the creditors of this bankrupt, and especially those represented by Mr. John J. Wade, as counsel, who took the appeal I have mentioned, are estopped by the decree of affirmance from insisting upon the validity of the creditors' suit in the Montgomery court, or any part of it, and are estopped from denying the exclusive jurisdiction of this court, in this bankruptcy proceeding, to proceed to ascertain the rights of the parties claiming the property which was sought to be subjected to division and sale in the state court.

It is objected that the petition and amended petition of Mrs. Anderson in this cause, being plenary, and not summary, should have been treated as a bill in equity, and that proceedings in it should have been according to the course of practice in plenary bills in equity. Objection is also made to the bankruptcy proceeding on the allegation that it is summary and not plenary, and therefore not a proceeding in which the trial of the rights of Mrs. Anderson as against the assignees in bankruptcy of this bankrupt, representing his creditors, should be had. On the contrary, a bankruptcy proceeding is more plenary than almost any other known to English or American jurisprudence. It is more so than the ordinary creditors' suit in chancery. As already said, it is itself a creditors' suit in its nature and objects. The difference is only in the practice; most of that in the bankruptcy proceeding being prescribed by statute. Many of the

matters connected with the proceeding are, indeed, as in creditors' suits in chancery, heard on rules *nisi* and motions to show cause, which are summary; but this is because the parties to those motions are already before the court in the bankruptcy proceeding, and it is useless to get out process to bring them in, and to resort to plenary methods in determining them. But petitions collateral to the bankruptcy proceedings, which in their nature are plenary, do not become summary merely from the fact that they are brought in the bankruptcy court. They are in form and character like collateral petitions brought in creditors' or other suits in chancery. In the case at bar, the bankruptcy proceeding was itself plenary, and the collateral petition filed in it by Mrs. Anderson was plenary. All the parties in adverse interest to Mrs. Anderson—that is to say, the assignees, and the lien creditors represented by them—being already in court as parties to the bankruptcy proceeding, it was unnecessary for petitioner to make them formally, by name, parties defendants, and to pray for process to bring them into court. They were already in court as parties defendant to her petition soon after it was filed, by force of the regular publications in bankruptcy.

It is contended that Mrs. Anderson had no right to file her petition in the bankruptcy proceeding as a collateral part of it, but ought to have brought a separate plenary suit either in the United States district or circuit court. Section 4979, adduced as authorizing such a suit, and the cases of *Smith* v. *Mason* and *Marshall* v. *Knox,* are cited as requiring that course to have been adopted. But section 4979 merely gives the option to an assignee to bring such a suit against a stranger to the bankruptcy proceeding, and gives a stranger such a right as against an assignee. It allows an option, but does not impose a duty. It does not require the assignee to go out of the district court or the bankruptcy proceeding to assert a claim, nor does it shut the door of the district court in the bankruptcy against a stranger. Efforts have been made to induce the supreme court of the United States to require, by judicial legislation, a resort to such suits, where persons not necessary parties to the bankruptcy proceeding have adverse rights to the assignee and creditors in the bankrupt's estate, but that court has refused thus to supplement the statute law by making that necessary which the statute leaves optional. There are cases, indeed, in which approved canons of procedure require that rights of property should be determined by methods pursued in suits other than bankruptcy proceedings,—that is to say, in ordinary common-law and chancery proceedings,—and the supreme court has held that in such cases resort should be had to suits at law or in equity.

In the case of *Smith* v. *Mason,* 14 Wall. 419, it held that where property belonging to the bankrupt's estate has, before the bankruptcy, been transferred to a "third party," who is not a party to the bankruptcy proceeding, and that person is in possession of the property, and the assignee seeks to recover the possession from him, the suit

must be brought at law or in equity, and that the property cannot be recovered from the "third party" by rule to show cause brought in the bankruptcy proceeding.  But in summing up the case, at the conclusion of the decision, the supreme court said: "Strangers to the proceedings in bankruptcy, not served with process, and who have not voluntarily appeared and become parties to such a litigation, cannot be compelled to come into court under a petition for a rule to show cause."  This language, therefore, limits and qualifies the rather broad terms which had been used by the court on pages 430, 431, implying that such persons as "cannot be compelled to come into court by rule to show cause" may not come in voluntarily, as Mrs. Anderson did.

In *Marshall* v. *Knox*, 16 Wall. 551, the same court ruled in the same manner.  There, a partnership firm were lessees of a plantation in Louisiana.  One of the partners went into bankruptcy.  The lessor, after this event, distrained for rent upon mules and other property found on the premises belonging to the firm; the sheriff acting as the distraining officer.  The assignee of the bankrupt partner thereupon sued out of the bankruptcy court a rule upon the lessor and the sheriff, requiring them to show cause before the bankruptcy court why they should not deliver to the assignee the distrained property. The supreme court of the United States held, on appeal, that the rights of the lessor, a third party in possession, who was a stranger to the bankruptcy proceeding, could not be adjudicated against his consent under summary rule to show cause sued out against him in the bankruptcy proceeding.

The case at bar is essentially different from both of those just mentioned.  The property with which we are concerned is in the constructive possession of the assignee, and in the actual possession of the bankrupt, who holds for the assignee.  It is thereby in the custody of this court, and is part of the assets in bankruptcy over which section 4972 gives it complete and exclusive jurisdiction.  It is not in the possession of a "third party," having color of title, whether as vendee, creditor, or sheriff, and the petition of Mrs. Anderson is not a summary rule against a "third party" to show cause why he should not be dispossessed of the property.  Moreover, the supreme court held in both cases last cited that the "third party" in each case could not be brought, by mere rule to show cause, into the bankruptcy proceeding to try rights of property against his will.  It did not decide, and has never decided, and I am sure will never decide, that a third party may not come voluntarily into a bankruptcy proceeding, by petition or other plenary method, and submit to the bankruptcy court his rights touching property in the custody of that court, claimed as assets by the assignee in bankruptcy.  Mrs. Anderson has come voluntarily into this court in this proceeding and asked the adjudication of her "specific claim" for property in the custody of the court upon which liens are claimed by creditors, who are already

in that court as parties to the bankruptcy proceeding, seeking to subject that property to their liens by decree of the bankruptcy court.

A petition, filed collaterally in a bankruptcy proceeding or other creditors' suit, calling for an answer, which answer is filed, and depositions taken on these pleadings through the course of many months, and then heard on an agreed "making up of issues," is a plenary proceeding, and binds all parties concerned. The petition of Mrs. Anderson, thus proceeded in, bound the assignees and all the creditors of the bankrupt. Even in creditors' bills, every creditor need not be made formally and by name a party to the record. A few creditors may maintain a suit in behalf of themselves and all other creditors standing in like relations to the debtor and his estate. The other creditors may come in and prove their debts, and may be treated as parties to the suit. If any of them decline to do so, they will be excluded from the benefit of the distribution of assets, and will nevertheless be bound by the decrees of the court. Story, Eq. Pl. § 99. Where the creditors are represented in the suit by a trustee or an assignee, the circuit courts of the United States refuse to hear motions or to receive petitions from individual creditors, require the trustee or assignee to represent them in all respects, and hold them bound by all orders and decrees to which the trustee or assignee is a party. As to trustees, this is a settled practice.

So it is in bankruptcy proceedings. The publication in bankruptcy brings all creditors into court. As early in the history of the practice, under the bankrupt act of 1867, as the year 1868, Judge TREAT held, in *Davis* v. *Anderson*, 6 N. B. R. 145, that "creditors of a bankrupt, having security, whether by judgment, mortgage, or otherwise, must prove their debts against the bankrupt, and foreclose their liens under the authority of the court in bankruptcy, or they may not only be barred of their debts, but may also lose the benefit of their securities. They are parties for the purpose of administering the estate, whether they formally come in or not. If they fail to prove their debts, and receive no dividends in consequence, they are barred." This ruling of a judge of very high authority has been followed ever since, and is only qualified by the exception of those cases in which specific liens are held on specific property, and the amount of the lien exceeds or equals the value of the property which it covers; in which cases nothing passes to the assignee.

Every judgment creditor of George W. Anderson was a party to the bankruptcy proceeding, *nolens volens*, whether he came in and proved his debt or not. The judgment creditors were so because their liens were general. The only creditor who was not as of course a party, was the representative of Robert Gibbony's estate, in favor of whom there was a specific lien on specific property. But this lien was for a sum inferior to the value of the property it bound. Such was the condition of that lien as to that property that the representative of that estate could not have enforced it without coming into the bank-

ruptcy court. As to Mrs. Anderson's petition, Mrs. Gibbony came in by counsel, and was represented in the depositions, and in the making up of issues, and in the decree of April 13, 1876. The lien creditors being parties to the bankruptcy proceeding in which Mrs. Anderson filed her petition, it was immaterial whether they were formally named as defendants in the petition or not. It was only necessary for her to state her specific claim and ask the protection of it by the court. By the filing of her petition, those against whose liens she claimed, being all creditors in court, became parties defendant to it. The agreement of December 20, 1872, even if it had been valid, could not put them out of court, if Mrs. Anderson chose to come in. When she came in it was unnecessary for her to make them parties by prayer for process. In *Stickney* v. *Wilt*, 23 Wall. 150, it was pointedly held by the supreme court that the fact that the petition did not pray for process, did not affect the sufficiency of the petition even against strangers to the proceeding; the court saying: "Beyond all doubt the petition contains every requisite of a good bill in equity, whether the pleading is tested by the statement of the cause of action, or by the charging part of the bill, or by the prayer for relief." Nor is it any objection to the validity of Mrs. Anderson's proceeding that her first pleading is in the form of a petition.

In *Stickney* v. *Wilt*, instead of bringing a distinct bill in equity in the United States district or circuit court, the assignee filed his petition in the bankruptcy proceeding, assailing the validity of certain mortgage deeds resting upon lands of the bankrupt held by persons who were in no way parties to the bankruptcy proceeding. They were not judgment creditors, but creditors having specific liens upon specific pieces of realty, one of them a vendor's lien and all the rest specific mortgages. They had not proved their claims, but stood out upon their specific securities. The assignee filed a petition assailing their liens and setting out his case, without praying or taking out process against them. They made voluntary appearance and defense; and, on appeal, sought to set aside all that had been done under the petition on the ground that the assignee should have brought a distinct suit in equity against them by formal bill. The supreme court held that the petition was a suit, and that the bankruptcy court had jurisdiction without process against lienholders, when they come in voluntarily. The mortgagees in that case were in the same relations to the petition filed that Gibbony's estate is in here. The only difference is that Mrs. Anderson files the petition instead of the assignee. The case of *Stickney* v. *Wilt* settles affirmatively the question whether contests respecting the property of the bankrupt between an assignee and persons having specific claims adversely can be litigated in the bankruptcy proceeding in cases where strangers to that proceeding come voluntarily into it, as was done by Mrs. Anderson on one side and Gibbony's representative on the other. The cases of *Smith* v. *Mason* and *Marshall* v. *Knox*, *supra*, so far from negativ-

ing the proposition, really affirm it. In both the latter cases the assignee sought to bring strangers to the bankruptcy proceeding into court against their will by the summary process of motions to show cause, and the supreme court held that this could not be done; ruling, in effect, that if an assignee seeks to litigate against strangers any right of property, especially where the property is not in the custody of the court, he must sue them as any other person must sue them, either at law or in equity, in a proper court other than the bankruptcy court sitting in bankruptcy.

I have thus shown that it is not a valid objection to the proceeding of Mrs. Anderson that it was a petition filed in the bankruptcy proceeding as part of it, instead of a distinct suit brought in the district court on its equity side; or that this petition did not make parties defendant by name, and pray for process against the lien creditors of the bankrupt who were already, by the publications in bankruptcy, parties to the proceeding; or that these·creditors and the assignee were not summoned each personally to appear and make answer to the petition, filed in a proceeding where they had already been summoned by publication and were constructively present; or that they had not formally appeared and made especial answer to the petition. The assignee was in court and pleaded the statute of limitations. Isaiah Welsh, administrator of J. R. Kent, much the largest creditor, appeared formally, and answered and filed a cross-petition, making all the defense that could be made, either by himself or other creditors, not only by negation of Mrs. Anderson's claim, but by affirmation of those of the lien creditors. All the other lien creditors, though not formally answering the petition of Mrs. Anderson, were in point of fact represented by counsel in the taking of depositions for eight months, and in the argument at the hearing. They were represented by the same counsel who had represented them in the state court, who had signed for them the agreement of December, 1872, and who now represented Welsh and the assignee. They were represented by that counsel in the "making up of issues" antecedent to the hearing preparatory to the decree of April 13, 1876. That hearing was on the eleventh of December, 1875. The argument was elaborate and full, oral and in writing, and made in behalf of all the lien creditors. After the hearing, the court held the case under advisement for four months. Thorough investigation was made of all the voluminous evidence; all proceedings in Montgomery court; and all the proceedings in bankruptcy. During that interval the court freely accepted additional notes and suggestions from counsel on the points involved. While the case was *sub judice,* I received a letter from Mr. Wade, dated on the twenty-seventh of January, which is filed in the cause, in which he said: "I have already said all I wish to say in the case, and, besides my oral argument, I left with Major Stiles a hastily written note of argument on the evening the case was submitted to your honor." This note I had. Seldom was a cause

more thoroughly contested, more fully and earnestly argued, or more deliberately and maturely considered, than the case between Mrs. Anderson and the lien creditors of this bankrupt at the hearing of December, 1875, upon which the decree of April 13, 1876, was rendered.

I do not now think that I was under legal obligation to require an amended petition to be filed by Mrs. Anderson. I am of opinion that all the creditors were bound by the decree of April, 1876. They were bound technically, because they were parties to the bankruptcy proceeding under the publications that had been made in bankruptcy. They were bound justly, because they had been efficiently and zealously represented by counsel during the whole period of more than two years, during which Mrs. Anderson's petition had been pending and progressing to a hearing. In point of fact, Mrs. Anderson's litigation was not with the lien creditors. Their claims were not contested in a single instance to the extent of a single dollar. They were conceded to be due. Her litigation was with the assignee as to what had passed to him by the adjudication in bankruptcy. It is true that the creditors were interested in the question, what estate passed to the assignee; but that officer was competent to contest that point, and they were not necessary parties to its litigation. They would never have been considered by the court as parties but for the agreement of December, 1872; and it was solely with reference to that agreement that they were afforded an opportunity and the privilege of coming into the litigation.

I gave Mrs. Anderson leave to file a petition which should make all lien creditors for whom Mr. Wade had signed the agreement of December, 1872, formal parties by name to her litigation. This leave was confined to those creditors. It was a requirement upon Mrs. Anderson,—a burden imposed, and not a boon conferred. It was for the benefit of the creditors, and really a leave given them to come in and contest the pretensions of Mrs. Anderson. How have they availed themselves of this privilege, which I conceive that the court was under no legal constraint to afford, and which it accorded out of mere grace? This will appear from what transpired after the thirteenth April, 1876. Appeal for supervision was taken from the decree of that date, which, on the twentieth May following, the chief justice dismissed, on the ground that has been stated. Very soon thereafter Mrs. Anderson's counsel, Mr. Stiles, began a correspondence with Mr. Wade for the purpose of making up a correct list of the lien creditors who were to be made by name parties defendant to the amended petition. In reply, Mr. Wade wrote under date of July 24, 1876, from a watering place in Montgomery county, a letter containing the following passage: "In the matters pending in the state court I represented the judgment creditors as they appeared by petition or otherwise down to and including Floyd Smith, (except Hartman & Straus,) being the first twelve in the list forwarded to me." The list com-

menced instead of ending with Floyd Smith. The last of the 12 was Elizabeth Gibbony, executrix of Robert Gibbony, who was doubtless meant. See *ante*, 487, for a list of these creditors, in the order in which they were named in the petition. Alluding to the creditors in the Montgomery suit, he said that those represented by himself "embrace all that could by any possibility have derived anything from the sale of the lands of Anderson if the court had settled that he owned a fee-simple title in the same, the aggregate amount of their judgments being in excess of the value of the lands. I think, upon a careful examination of the list, I can act for all the other creditors except Barrett & Higgins and Miller & Co.;[1] and I will either act for them or get Major Taylor to accept service of process as their counsel. This will relieve you of the necessity of service of process as to any of the creditors. * * * I agree that the testimony now filed in the cause on both sides may be read in evidence upon the issues upon the amended petition, to the same effect as if notice had been given to all the parties, but subject to all just exceptions from any other cause. Prepare your amended petition and send it to me here by the eighth August. I will then indorse acceptance for such creditors as I represent, and get Major Taylor to do the same for the other creditors, he and I representing all the creditors." The amended petition was accordingly sent him by Mr. Stiles on the fifth of August, 1876, having attached to it, as exhibits, lists of the lien creditors of the bankrupt. This petition appears to have been lost or mislaid by Mr. Wade for a long time, and was not returned to Mr. Stiles until February 3, 1880; the exhibits not until several months later.

Meanwhile notice had been given to Mr. Stiles of a motion on the part of some of the creditors to remove the case to the Western district of Virginia, at Lynchburg, which motion was once abandoned, then renewed, and set for hearing October 30, 1880, argued several times on several different grounds, always strenuously resisted by Mrs. Anderson's counsel, but finally granted June 16, 1881, as has been seen. Through the failure of the movers to comply with the provisions of the statute in respect to removals, the papers were not actually brought to Lynchburg until the thirtieth of August, 1881. On the seventh of January following, notice was given by creditors of a motion to dismiss the original petition of Mrs. Anderson, and to set aside and annul the original restraining order granted upon it.

The notice was signed by John J. Wade and T. E. Sullivan, attorneys for James R. Kent's administrator, and Robert Gibbony's executrix, and others. These were the same counsel that had represented the assignee and all the creditors in the elaborate and protracted proceedings in the case, while pending at Richmond. The notice fixed the hearing for the sixth of February, 1882, in chambers, at Charlottesville, before Judge RIVES, then judge of the Western

[1] These had no part in the agreement of December, 1872, and had no right to be made parties to the amended petition.—HUGHES, J.

district. This being but a month before the spring term of the court at Lynchburg, the hearing was adjourned to the latter place in term. The matter was afterwards several times delayed or continued, at the instance of counsel for creditors, but finally, at the fall term held at Lynchburg in September, 1882, where, in consequence of the resignation of Judge RIVES, I sat by designation, the motions to dismiss and set aside were overruled, and the amended petition of Mrs. Anderson was filed, against the opposition of counsel for the creditors of the bankrupt, who strove again for delay.

The petition was filed, and all creditors for whom Mr. Wade had signed the agreement of December, 1872, were served with process to answer it, either by actual service or by acceptance of service by counsel, except D. Preston Parr and Samuel Straus, surviving partner of Hartman & Straus. These latter were non-residents residing in Baltimore, Maryland, who had small claims of about $175 each. Mr. Wade had signed for them the agreement of December, 1872, and had represented Parr subsequently in the court; certainly as late as his letter of the twenty-fourth July, 1876, which was after the decree of April, 1876. They were both cognizant of the proceeding of Mrs. Anderson, and of its full purport. This fact is shown by their affidavits to petitions and answers now filed in the record, which were prepared by Mr. Wade for them in Baltimore, and to which they swore on the twenty-fourth of March, 1883, during the term of this court at Lynchburg, which had commenced on the 20th, and to which process that had been served on resident defendants to the amended petition of Mrs. Anderson was made returnable.

At the beginning of the term of court just mentioned, Mr. Sullivan, one of the counsel for lien creditors, was present, and asked the court to defer action on the petition until Mr. Wade, his associate, who was expected in a day or two from Baltimore, would be present. No answer was presented or defense made by any of the 12 defendants to the petitions, and Mr. Sullivan soon disappeared. The court deferred action in the matter for a week, and, none of the defendants having made objection, the final decree of March 26, 1883, was entered. This decree was, in substance, but a repetition of the decree of April 13, 1876. The 12 lien creditors who, through Mr. Wade, were parties to the agreement of December, 1872, had been allowed the privilege of coming personally into court and contesting the claim of Mrs. Anderson. Process had been served on, or service of it accepted for, them by 10 of the 12. The other two, who were creditors for inconsiderable amounts, were aware of the petition, but had not come into court. Instead of coming promptly in while there was yet opportunity, these two had remained away and contented themselves with preparing dilatory papers four days before the end of the term at Lynchburg, and sending them to counsel here too late for them to be filed during the term. Their counsel, Mr. Wade, who had represented most of the other creditors, and had accepted service of process for

these others two months before, and who lived in Baltimore, where
D. P. Parr and Samuel Straus resided, and who prepared their pa-
pers for them, and was in correspondence with counsel here in their
behalf, instead of appearing at Lynchburg and making defense for
the other creditors, as Mr. Sullivan, his associate, informed the court
that he would do, remained in Baltimore, where he prepared the dil-
atory papers which reached counsel in Lynchburg eight days after
the term of court had commenced, and a day after the decree of the
twenty-sixth March was entered.

By requiring Mrs. Anderson to file an amended petition, making
the 12 creditors parties defendant to it by name, the court had ac-
corded these defendants a privilege. Notwithstanding this concession
to them, these creditors by counsel resisted the filing of the amended
petition, and when it was filed, and they were summoned into court,
failed to appear. The court did more than it was called upon *stricti
juris* to do, when it required that they should be made parties. When,
on being summoned, or apprised that the privilege was accorded them,
they failed to avail themselves of the opportunity of making personal
defense, the court could do nothing but grant the decree in favor of
Mrs. Anderson, which it entered at Lynchburg near the close of the
March term of 1883. The defendants Parr and Straus were in fact
bound by the decree of April, 1876, being, as creditors, parties in
court under the publications in bankruptcy. They were, besides,
during the March term of 1883, personally cognizant of the petition
of Mrs. Anderson, to which they signed an answer, and of the priv-
ilege which the court had accorded them of making defense to it. They
failed to make that defense in time; and the court is not at liberty,
with any respect for the rights of Mrs. Anderson, who has been a pa-
tient and diligent suitor at its bar for 12 years, to reopen decrees to
which no substantial objection has been shown, and which were most
maturely considered and deliberately passed, first in April, 1876, and
next in March, 1883, and to which no effective appeal has been taken.

The petitions now before the court of several or all of the 12 cred-
itors that have been mentioned, contain nothing substantially new.
The objections which they raise to the decree of March, 1883, are all
either strictly technical, or set out grounds that have been repeatedly
overruled by the court in this proceeding; especially at the hearing
at Richmond in December, 1875. The assignee and creditors were
concluded by the decree of April 13, 1876, except from appeal. *That*
they lost by invoking the supervisory instead of the appellate juris-
diction of the circuit court in May, 1876. Allowed by the decree
thus unsuccessfully appealed from to come in and make defense to
the amended petition, the 12 creditors failed to avail of this privi-
lege, and permitted the decree of March, 1883, to be entered against
them. Appeal from that decree was open to them. They could
have invoked the appellate jurisdiction of the circuit court, but they
neglected to do so. Several of the 12 creditors could have carried

the case beyond the circuit court to the supreme court of the United States. They all neglected the recourse which was thus open to them, and the door of appeal is therefore closed to the decree of March, 1883. They now ask a review here. After neglecting to ask the circuit court to review the district court, and then to ask the supreme court to review the decree of the circuit court, if adverse, they now adopt the expedient of asking the district court to review two deliberate decisions made by itself, one of them nine years ago. The right to ask a review of the decree of March, 1883, expired as to all cases pending at Lynchburg at the end of the term which commenced on the twentieth of March, 1883, which terminated not later than the night of the eighteenth of September, 1883. These petitions for review were none of them filed until the first day of the fall term of 1883, at Lynchburg.

Proceedings in bankruptcy, in matters plenary in character and assimilated to equity suits, (which counsel for creditors insist that Mrs. Anderson's petition is,) are required by rule 32 in bankruptcy to be conformed as nearly as practicable to suits in equity; and the eighty-eighth rule in equity forbids petitions for review, where appeal would lie, from being brought after the expiration of the term during which the decree complained of is rendered. All these petitions for review, therefore, having been brought after the expiration of the term which commenced on the twentieth of March, 1883, at Lynchburg, are brought too late, and cannot be entertained. I will enter a decree dismissing them all, as well on the merits as on the ground that they are brought too late.